UNITED STATES of America, Plaintiff,

v.

An ARTICLE OF DRUG consisting of 2,000 cartons, more or less, each containing 2 empty vials and 2 bottles of liquid, and 1 insert, labeled in part: "Poison OVA II Contains Hydrochloric Acid. Use Solution only as directed. * * * First Aid * * * Mfg. for Faraday Laboratories * * *", etc., Faraday Laboratories, Inc., Claimant.

Civ. No. 745–72.

United States District Court,
D. New Jersey.

July 16, 1975.

Jonathan L. Goldstein, U.S. Atty. by Bernard S. Davis, Asst. U.S. Atty., Newark, N.J. and Arthur Levine, Atty. of U.S. Food and Drug Administration, Washington, D.C., for plaintiff.

Alfonse J. Cifelli, Totowa, N.J. (Marcus, Rosen, Breslow, Levy, Jaffe & Fiorello, Totowa, N.J., and Robert H. Becker, Washington, D.C., of counsel), Kleinfeld, Kaplan & Becker, Washington, D.C., for claimant.

Opinion and Order

BIUNNO, District Judge.

This case involves the question whether a kit of chemicals and equipment, marketed in interstate commerce by Faraday Laboratories, Inc. under the name "OVA II", is a "drug" within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 et seq.

The kit is marketed with literature indicating its use for the purpose of performing, in the home, a "preliminary screening test" by which a human female, having some reason to suspect that she may be pregnant, may obtain an indication of probability that she is or is not pregnant.

The United States (FDA) filed a complaint for forfeiture and condemnation of several thousand kits seized within the jurisdiction of the court 21 U.S.C. § 331, and Faraday, as claimant, resists that action.

Based on discovery materials, both sides had moved for summary judgment and both motions were denied because of a number of uncertainties as to both law and facts precluding summary judgment. Opinion and Order dated April 10, 1974.

By supplemental memorandum dated April 19, 1974, the court posed a series of inquiries to explore the question whether the matter could be dealt with on cross-motions for summary judgment. The parties have since submitted a detailed "Joint Response" which, for the most part embodies answers that both sides agree on, and for a few sets out areas of disagreement, with the posture on each side explained, these being mainly in areas of interpretation rather than matters of fact. The questions raised and the responses given are illuminating.

Both parties have now renewed their motions for summary judgment and have submitted argument in light of the Joint Response.

The major difficulty in reaching a decision on the motions arises from the phrasing of the statutory provisions involved. The statutory definition of a "drug", for this purpose, set out in 21 U.S.C. § 321(g)(1), makes use of ordinary words of the language in such peculiar and special senses as to make interpretation an uncertain task.

Three alternative definitions are involved here:

A. "Articles" recognized in the official United States Pharmacopeia, and other identified compendia, are "drugs";

B. "Articles" intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animals are "drugs";

C. "Articles" intended to affect the structure or any function of the body of man or other animals are "drugs".

FDA claims that the Ova II kit falls within all three definitions. Faraday claims that it falls within none. Both sides agree that if it comes within any of the definitions of a "drug", it is also a "new drug" as defined by 21 U.S.C. § 321(p), and may not be marketed in interstate commerce without first filing a "new drug application" on the basis of which FDA determines that it is "safe and effective", 21 U.S.C. § 355.

It should be observed in passing and for context that historically, a dispute on the question whether something is "safe and effective" was normally resolved on the basis of expert testimony adduced in the course of the litigation. Under the present scheme, that method is excluded and two new alternative methods are provided. One, if the item is one which has recognition in the technical and professional literature, in the form of papers by investigators competent in the field, it is accepted as being an "old drug" which may be marketed in interstate commerce without further proof that it is "safe and effective."

Two, if the item has no such body of published literature to support the proposition that it is "safe and effective", there must first be an administrative determination by FDA, as the disposition of a new drug application, that it is "safe and effective".

The term "safe" and "effective", in some contexts, may be more or less absolute terms. Most people think of something as being "safe" when its use or application under any conceivable set of circumstances is not likely to cause some kind of harm or damage. They will think of something as being "effective" when its use or application invariably achieve the desired result.

But in real life it may be doubted whether these terms can have any absolute meaning and in most situations, if not all, the terms express relative concepts.

Thus, everyone knows that plain water may be thought of as being safe and effective for the removal of a stain of cherry-colored sugar syrup from fabric. This will be true if the fabric is ordinary cotton, or linen, or polyester and the like. But if the fabric contains a "filler", or is colored with a water-soluble dye, the use of water may damage the fabric while removing the stain. In those conditions, while effective, the use of plain water will not be safe.

Similarly, in cases where water will not harm the fabric, it will not be effective if the stain contains oil or grease. For them, a solvent such as alcohol, kerosene or benzene may be needed. These may be effective, but because they give off flammable fumes, care must be taken in using them. Oxalic acid is effective for the removal of rust stains, but it is a poison and must be used with great care. Are these products "safe"? Under what conditions?

Thus, it is plain that the terms are relative and not absolute. and a designation that something is "safe" or "effective" involves collateral questions such as "to whom or what", and "for what purpose", and "compared to what"?

The court is not called upon in this case, whether decided on the motions or by trial, to decide whether Ova II is "safe and effective". But the brief evaluation of these terms is important as context because it is plain that the underlying purpose of the Act is to limit interstate commerce in "drugs" to those that are "safe and effective", either because they are old drugs whose qualities are regarded as established by the published literature or because they are new drugs whose qualities in that regard are passed on by FDA as the culmination of a new drug application.

■ This context is of assistance in determining the proper boundaries of the term "drug" in the peculiar and artificial sense employed in the definition of the term.

It should also be observed that the Food, Drug and Cosmetic Act (FCDA), does not purport to encompass the entire federal field. Other acts dealing with one or another aspect of the entire subject include:

Public Health Service Act, 42 U.S.C. § 262;

Controlled Substances Act, 21 U.S.C. § 801 et seq.;

Controlled Substances Import and Export Act, 21 U.S.C. § 951 et seq.;

Narcotic Addict Rehabilitation Act, 42 U.S.C. § 3401 et seq.;

Hazardous Substances Act, 15 U.S.C. § 1261 et seq.;

Fair Packaging and Labeling Act, 15 U.S.C. § 1451, et seq.;

Poison Prevention Packaging Act, 15 U.S.C. § 1471 et seq.;

Caustic Poison Act, 15 U.S.C. § 401, et seq.;

Federal Trade Commission Act, 15 U.S.C. § 45.

The parties agree that these acts, as well as the FDCA, generally derive their authority from the commerce clause of the U.S. Constitution, Art. I, § 8.

It is also agreed that regulation of the practice of the health professions, such as medicine, veterinary medicine, dentistry, pharmacy, nursing, and the like, is predominantly dealt with by state law rather than federal law, even though some aspects of the practice may involve compliance with one or another federal law. Most states also have laws in regard to food and drugs as well as water supply, sewage and garbage disposal, sanitation, quarantine and other matters of concern from a public health standpoint.

The major division of jurisdiction is plainly on the basis of whether the subject-matter is intrastate or interstate, except only as the state are authorized, without the consent of Congress, to levy imports or duties on imports or exports to the extent absolutely necessary for executing their inspection laws, U.S. Constitution, Art. I, § 10.

Turning to the Ova II kit, the facts are that it consists of two glass vials, and two

bottles of solutions. Bottle A contains a solution of hydrochloric acid (HC1). Bottle B contains a solution of sodium hydroxide (NaOH). Use of the kit involves taking a quantity of fresh urine and reacting it with both solutions in the two vials, with differences between them in respect to the number of drops added and the time sequence of the addition. The presence or absence of distinct visual differences in the darkness of the two quantities of urine so treated forms the basis for the indication (distinct differences of color indicates absence of pregnancy, essentially similar color and saturation indicates pregnancy)

This test is in glass, outside the body, using body fluids available by ordinary bodily processes (i.e., "*in vitro*." to use the technical term). The test does not involve the injection or ingestion of any material in the human body itself (i.e., "*in vivo*").

Items which are "drugs" as contemplated by the statute fall into two major functional categories. One such category is the "diagnostic" function. The other is the "treatment" function, in the broadest sense that embraces prevention and alleviation of pain or discomfort as well as "cure."

Those items related to the treatment function are necessarily "in vivo." Something must be done, or applied to or placed within the body itself to provide treatment. At least in this country, treatment outside the body, as by inserting pins in a doll, is not considered to be treatment.

Those items related to the diagnostic function may be either "in vivo" or "in vitro." The test of a urine sample for the presence of sugar is "in vitro," and is a means for diagnosing the disease of diabetes. The presence of certain enzymes in the blood, with the test performed "in vitro" may indicate heart disease in the form of a myocardial infarction.

On the other hand, the Schick Test, which involves the intradermal injection of a dilute toxin, is an "in vivo" diagnostic procedure to determine susceptibility or immunity to diphtheria. Similarly, scratch tests which involve the tearing of the skin surface and the application of allergens are another example of "in vivo" diagnostic procedures for allergies and sensitivity to various substances. A gynecological examination is also "in vivo."

In the ordinary sense of the word "drugs," it would be rational to limit its meaning to items used or applied for diagnostic purposes to those employed "in vivo" and not for those employed "in vitro." There can be little question that for the entire array, this distinction will usually be valid.

But an overlap between these two areas arises by reason of the decision in *U. S. v. An Article of Drug . . . Bacto-Unidisk*, 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969). The item in that case involved a sheet in disc form, on which the manufacturer applied a variety of antibiotic preparations. The intended use was to permit a rapid and essentially simultaneous differentiation of effectiveness of the various antibiotics to treat an infectious disease. In use, a sample of infected material taken from the patient was placed in a petri dish and cultured. The disc-shaped sheet with different antibiotics was then placed in contact with the culture, and the results observed, the index being that the area with the effective antibiotic would turn clear.

Both the District Court and the Court of Appeals concluded that this testing disc was not a "drug," and hence not a "new drug" requiring a determination that it was safe and effective, as the end result of a new drug application, before it could be marketed in interstate commerce. This result rested largely on the view that the disc was a "device" falling within the statutory exception, 21 U.S.C. § 321(g)(1) and, (h) to the otherwise broader definition of a "drug."

The Supreme Court reversed and held that the disc was a "drug." Careful analysis of all the opinions in the case indicates that this conclusion reached to the outer boundaries of what might be found to be encompassed by the definition "drug." The fundamental rationale of the conclusion rests on the context within which the disc was used. The activating circumstances

would necessarily involve the existence of a patient known to be ill, i.e., suffering from a disease, and that an infection was involved. Also involved is the circumstance that the identity of the infecting organism was not known. Without an item like the disc, a treating physician might be obliged to try one antibiotic after another, by way of "challenge and response" to find out what treatment would be effective. The disc, which applied a whole spectrum of antibiotics to a cultured specimen of the infected material offered a diagnostic tool for simultaneous testing of what would be effective.

On the face of the statutory language, the disc doubtless fell more clearly within the exception of a "device" carved out of the definition of a "drug." At best, the question was on the edges of the outer boundaries.

The Supreme Court accepted a generous and broad construction, no doubt influenced by the life-and-death risks involved in achieving a correct diagnosis to identify the specific infection at the earliest possible moment, so that effective treatment might begin without avoidable delay.

Considerations of like nature are non-existent here. The condition of pregnancy, as such, is a normal physiological function of all mammals and cannot be considered a disease of itself. Pregnancy is an execution of an inherent bodily function and implies no ailment, illness or disease. Both parties agree that this is so.

It is also a fact that there is no occasion for anyone to perform a pregnancy test unless there is a prior factual history to justify it. At least two events must have occurred before any question of a pregnancy can arise. One, there must have been a placing of male sperm within the female genitals, and, two, there must have been thereafter an interruption of the female menstrual cycle. There is only one widely recognized instance of immaculate conception. All other mortals, burdened with original sin, must have these two events occur before performing a pregnancy test

for any purpose other than an academic one.

A test for pregnancy, then, is not a test for the diagnosis of disease. It is no more than a test for news, which may be either good news or bad news depending on whether pregnancy is wanted or not.

It must be emphasized that the question whether the Ova II test is reliable or not is not an element bearing on the outcome. In the first place, as the Joint Response establishes, the entire process from conception to delivery or other termination involves observable events and changes in the body that have been known for as long as the human race has propagated itself. Individuals know their own bodies more than they know anything else, and are the first to become aware of changes such as those associated with pregnancy. They need not be detailed here; they are briefly noted in the Joint Response, fully detailed in the medical texts, and well known to one and all.

The key point is that no pregnancy test, including those recognized by FDA as not only "safe and effective" but also considered by it as the *most* "safe and effective" (a quality not required by the Act), is fully 100% reliable, and even if they were 100% reliable would disclose no more than that pregnancy exists or does not exist. No presently known pregnancy test is designed to or capable of differentiating between a pregnancy as such and an ailment or disease arising out of the pregnancy such as an abnormal pregnancy (i.e., tubal) or a pregnancy not indicated (i.e., in a female with hypertension of mental illness), or a disease (i.e., toxemia of pregnancy).

These ailments or diseases have other symptoms, other conditions or history, and the like, that must be separately diagnosed. Neither Ova II nor any other pregnancy test attempts to do so. In the context of the issues here, the fact that there may be ailments or diseases related to pregnancy or associated with it is not an element that may be considered.

■ On the central question, then, the court is satisfied that there is no genuine

issue on any material fact, and that Faraday is entitled to judgment as a matter of law. This determination rests on the view that the Ova II kit is not a "drug" within any rational sense that may be attributed to the term as defined.

There is no dispute that FDA has the burden of persuasion. Taking each of the three definitions of a "drug," as set out in 21 U.S.C. § 321(g)(1), it is plain that the Ova II kit does not fall within any of them.

The first definition, i.e., recognition of an item in the U.S. Pharmacopeia, National Formulary, etc., cannot be taken literally. In the first place, none of these compendium publications is more than a privately sponsored set of standards of strength and purity, for medicinal use, which may properly carry labeling such as "U.S.P." or "N.F.," and the like. The overwhelming mass of items for which there are monographs are substances or chemicals whose use for medicinal purposes calls for a high degree of adherence to uniform standards of strength and purity. As any reading in widely used reference works will disclose, just about everything in nature except the noble metals is combined with other materials. Nothing is absolutely pure. The efforts of pharmacy as an essential supporting pillar to medicine, have aimed over the centuries toward the providing of materials that could be prescribed reliably and with confidence as to quality and quantity.

But there are economic restraints. Common materials such as table salt (NaCl) can no doubt be prepared under laboratory conditions to be essentially pure within extreme limits, such as half the thickness of a cat's whisker. But for realistic purposes, nearly all uses of salt do not require this degree of purity and hence the economic cost cannot be justified. The engineer's rule that "good enough is best" is the common denominator in the striking of balances. Surface water runoff, taken from a pond, may not be potable but it is good enough to wash a car, work a paper mill, condense steam or quench steel.

These compendiums and pharmacopeiae, being privately published, make changes from time to time. And thus the question arises whether they can have the force of law without running afoul of the principle that a legislative body may not lawfully delegate its functions to a private citizen or organization. Limited delegation of legislative functions to governmental agencies within the boundaries of an expressed norm, standard or guide is well recognized; but a delegation to private groups, and without such boundaries, is quite another matter. There is a further paradox too, in the fact that the substances or chemicals having the strictest standards of all, as to strength and purity, namely the reagents used to assay commercially produced materials, have their standards set by the American Chemical Society, whose professional publication is not among those designated by Congress. The implication of this is that a reagent grade substance, which is held to higher and stricter standards of quality and purity than the same substance which meets U.S.P. assay requirements, may not be used to compound a medication. Nor is it a "drug" regulated by FDA.

■ Since the Congress will not be presumed to have enacted an invalid statute, the first definition, i.e., recognition in the U.S.P. or other named compendium must be read to mean that:

(a) an article put into the stream of interstate commerce with the intention that it be used for medicinal purposes, as evidenced by the label designation "U.S. P.," "N.F.," and the like, must meet the privately designated standards for quality and strength, or else be subject to appropriate action for misbranding or adulteration;

(b) the recognition of an item in the U.S.P., etc., by a monograph, coupled with a label indicating compliance with standards, constitutes evidence that the item is a "drug" as a matter of prima facie proof only, calling on the opposing party to come forward with contrary evidence or else risk an adverse ruling;

(c) the marketing, use or possession of a recognized item, even one labeled "U.S. P.," for non-medicinal purposes does not

imply a violation of any provision of law; for example, Arm and Hammer Baking Soda, which may be found on the shelves of most supermarkets, is labeled as "Bicarbonate of Soda U.S.P. A pure and natural product for over 125 years," and the packaging indicates such uses as cleaning combs and brushes, deodorizing ash trays in automobiles, deodorizing refrigerators, smothering flames, and similar non-medicinal uses. No doubt, industrial grade bicarbonate of soda would serve equally well for these purposes, but the fact that a U.S.P. grade is widely sold implies that the differential costs of production, packaging and marketing an industrial grade rather than a U.S.P. grade are too small to justify two product lines. It is probably cheaper to produce U.S.P. quality for all purposes.

(d) an item recognized in U.S.P., etc., such as sodium hydroxide, hydrochloric acid, or whatever, by name, is not a drug if it is put into the channels of interstate commerce without a label such as "U.S.P.," "N.F." and the like, to imply that it is intended for medicinal use.

Under this interpretation, the Ova II kit is not a drug under 21 U.S.C. § 321(g)(1)(A), despite the fact that it contains sodium hydroxide and hydrochloric acid, since it is not labeled "U.S.P." etc., and is not marketed for medicinal use.

The second definition, namely articles related to the diagnosis of disease, etc., does not apply to the Ova II kit because its purpose is to indicate the existence or non-existence of pregnancy, which is not of itself a disease, and because no other pregnancy test attempts or purports to do anything more than Ova II does.

The third definition, articles intended to affect the structure or any function of the body is obviously not applicable to any article which is used "in vitro," and in no way inserted in, injected in, ingested by or applied to the body.

What has been said here is not intended to imply that the Ova II kit will reliably indicate the presence or absence of the condition of pregnancy as such. It may be the best test ever devised, or it may be useless.

The question of misbranding on this account, within the meaning of 21 U.S.C. § 352(a), although included in the pleadings, has been effectively removed from the case on the submissions made.

This is no doubt the result of the question raised by the court in the opinion dated April 10, 1974, whether a potential claim by the United States that Ova II violates 15 U.S.C. § 45 for making an affirmative claim for a product without having a reasonable basis (false advertising) should be asserted now or be lost. Such a charge comes within the jurisdiction of the Federal Trade Commission and applies to all items in interstate commerce, whether they be "drugs" or not, except for prescription drugs, and Ova II is not in that category.

■ Since the United States is plaintiff and is a single party, the court raised the question whether the potential violation of the FTC law (which Faraday concedes the FTC may assert) should not be joined, under the principle that all related claims by one party against another should be litigated in a single proceeding.

FDA has indicated that the administrative structure and procedure is not such as to make possible the joinder of any FTC claims in this case. The elimination of the misbranding claim under 21 U.S.C. § 352(a) is doubtless intended to avoid a collateral estoppel as to FTC. Whether or not it has that effect must await another proceeding and determination.

In arriving at these conclusions and determinations, the court has not considered the implications of pending legislation, such as S.510 (Calendar No. 33, Report No. 94–33), passed by the U.S. Senate on April 17, 1975 even though it would define a "device" as embracing in vitro reagents intended for use in the diagnosis of "conditions" (i.e., pregnancy), other than disease. The reason for this is that the pending bill is not law, and the disposition here must be made on the basis of the law as it stands now.

For the reasons stated in this opinion, the FDA motion is denied and the Faraday motion is granted. Summary judgment will be entered accordingly in favor of Faraday.

SO ORDERED.

## APPENDIX

A considerable amount of reference material was reviewed in the course of arriving at a rational interpretation of the term "drug," as used in 21 U.S.C. § 321(g)(1)(A). Its bulk was such as to preclude its inclusion in the opinion itself. Yet, the significance of it is of sufficient importance to call for preservation of a summary because it has potential reference value, and also provides context for the interpretation.

## The Statutory Provision

21 U.S.C. § 321(g)(1)(A) defines as a "drug" (among other definitions) articles "recognized" in the "official" United States Pharmacopeia (USP) the National Formulary (NF) and the Homeopathic Pharmacopeia (HP).

As the Joint Response (par. 1) discloses, all three are publications of private organizations, and are not published pursuant to any "authority" other than the right of individuals or organizations to publish such works as they deem appropriate and useful.

U.S.P. is published by the United States Pharmacopeial Convention, Inc. NF is published by the American Pharmaceutical Association. HP is published by the Committee on Pharmacopeia of the American Institute of Homeopathy. Thus, their status generally is not unlike that of legal publications such as the Restatements and Model Codes adopted by the American Law Institute, or the Uniform Acts and Codes published by the Commissioner on Uniform Laws and approved by the House of Delegates of the American Bar Association. In the discussion that follows, major attention will be given to the U.S.P., which is representative for this purpose of all three publications.

The statute has used the "recognition" of an "article" in the U.S.P. as one of the three alternative definitions of the term "drug." It has also referred to the U.S.P. as "official."

From what can be found, the U.S.P. is "official" only in the sense that it is an official publication of a highly respected but nonetheless private organization. It does not imply that the U.S.P. is the product of any governmental action. Indeed, the flyleaf of the U.S.P. itself contains a "Notice and Warning" that the U.S.P. text "is fully copyrighted." This could not be the case if the U.S.P. were an "official" publication of a government; such publications are in the public domain.

It is also stated, on the same page, that the appearance of standards for a drug in the U.S.P. does not exempt the drug from compliance with Acts of Congress or regulations and rulings issued thereunder.

As will be detailed hereafter, it also appears from a detailed review of many items in the U.S.P. that the meaning of the term "drug," as applied to them, refers to one or more of the characteristics, values or uses of the item, i. e., the qualities and applications for medicinal purposes, and not as a comprehensive noun for the item itself. There are some items, of course, whose sole qualities and uses so far as now known are medicinal ones. For these the term "drug" may well be a comprehensive noun. But the great mass of the items are chemicals, substances or materials having a multiplicity of qualities and uses, of which the medicinal aspect is only a part.

## Nature of a Pharmacopeia

A pharmacopeia is primarily intended as a means for stating the standards of identification, strength and purity of chemicals, substances and materials used by physicians for medicinal use and prepared for them by pharmacists. The standards are essentially professionally established.

Even when a government declares a standard, it is necessarily a reflection of a professional judgment because no legislature or agency can establish a standard of this

kind without having the professional information as a foundation.

In many countries, a national pharmacopeia is adopted by law and has the force of law. The United States evidently is not one of those countries. See, *Encyclopaedia Brittanica* (Eleventh Ed.) "Pharmacopoeia," and *Encyclopedia Americana,* "Pharmacopeia."

By 21 U.S.C. § 377, the Secretary of H.E.W. is authorized to cooperate with associations and scientific societies in the revision of the U.S.P. In addition, 21 U.S.C. § 358 empowers the Secretary of H.E.W. to designate an official name for a drug, to review existing names, to request the compiler of an "official" compendium to recommend a name, and to designate a name (in accordance with Title 5 U.S.C.) at the request of a compiler.

Under the authority of 21 U.S.C. § 357, the standards of potency and purity for antibiotics are no longer established by U.S.P. (see U.S.P. XVIII, p. 791); they are now established by the F.D.A. through published regulations, 21 C.F.R. Parts 130–146e and 147 to End.

Similarly, the standards for "biological products" (e. g., antitoxins, blood derivatives, vaccines, etc.) are no longer established by U.S.P. (see U.S.P. XVIII, p. 791); they are now established by the Public Health Service under the Public Health Service Act of 1944 (42 U.S.C. § 262) and administered by the Division of Biologics Standards of the National Institutes of Health, 42 CFR Part 73. [Note: Since 1970, this Bureau has been transferred to the FDA and the regulations are at 21 CFR Part 600–680]. Cf. *Griffin v. U. S.,* 500 F.2d 1059 (CA 3, 1974).

Thus, for these two categories, i. e., antibiotics and biologics, the standards are now established and promulgated by law rather than by private organizations, and are truly "official" in every sense of that word. For all other categories in U.S.P., the items appear to be "official" only in the sense that they are included in an "official" publication of such organizations, and in the sense that failure to adhere to those standards would violate the misbranding and adulteration provisions of the FDCA. This is evidently what is meant by U.S.P. when it says that federal "recognition" of the authority of U.S.P. "did not come about until 1906 with the enactment of the first Pure Food and Drugs Act. This law designated the Pharmacopeia as the source of the standards of strength, quality and purity of *medicinal products* recognized therein when sold in interstate commerce *for medicinal use*" (U.S.P. XVIII p. xxvi) (Emphasis added).

In their earliest days, pharmacopeias were published works that gathered the prescriptions developed by physicians of greatest eminence. This served the purpose of disseminating useful professional information to the physicians and the pharmacists. The prescriptions of those days were evidently very complicated and used many "natural" ingredients obtained from various leaves, flowers, plants and animals. These included crabs' eyes, pearl, oyster shells, coral, moss growing on a human skull, blind puppies, earthworms, and a wide variety of excrement (*Britannica, supra*). [BUT NOTE that the venom of the Maylayan pit viper is the source of the anticoagulant "Arvin," even today].

In England, these ingredients as well as other "drugs and medicines" were sold by grocers as well as by apothecaries, but in 1617 the latter obtained a separate charter barring grocers from keeping an apothecary's shop. This limited the preparation of physicians' prescriptions to apothecaries, and in turn brought pressures on them to dispense accurately. This was accomplished by the publication of a pharmacopeia in 1618 by the College of Physicians, and they, together with the wardens of the apothecaries, were authorized to examine apothecaries' shops within 7 miles of London and to destroy compounds they found to be "unfaithfully prepared." *Idem.* This appears to be the origin of the present laws on misbranding and adulteration.

As recounted in the Brittanica, the trend of pharmacopeias over the centuries was to weed out the complicated prescriptions and

"ridiculous remedies" and to emphasize the standards for "simples" (i. e., individual items or ingredients).

In the United States, the general policy of the U.S.P. from the first edition in 1820 was "to select from among substances which possess medicinal power, those, the utility of which is most fully established and best understood; and to form from them preparations and compositions, in which their powers may be exerted to the greatest advantage. It should likewise distinguish those articles by convenient and definite names, such as may prevent trouble or uncertainty in the intercourse of physicians and apothecaries." This policy has followed in each succeeding decennial edition, yet "despite steadfastness in admitting only drugs of established merit, the number of U.S.P. drugs has risen steadily . . ." (U.S.P. XVIII, pp. xxv-xxvi).

### What is In a Pharmacopeia

As noted above, the early pharmacopeias consisted largely of collections of prescriptions in use, just as a cookbook contains a collection of recipes and instructions for preparing various dishes.

While there are some in U.S.P. XVIII, they form a small part of the collection. Examples are "Cherry Syrup," p. 106; "Citric Acid Syrup," p. 135; "Coal Tar Ointment," p. 136; "Cocoa Syrup," p. 139; "Cold Cream," p. 143; "Diphenhydramine Hydrochloride Elixir," pp. 208–9; "Glycyrrhiza Syrup," p. 287; "Paragoric," p. 474; "Ringer's Injection," p. 593; "Sulfur Ointment," p. 701; "Wild Cherry Syrup," p. 781; and "Zinc Oxide Ointment," p. 785. Some of these are flavorings and vehicles to which one or another therapeutic agent is added.

This change in content from prescriptions to ingredient items no doubt is a reflection of the trend in pharmacy over the decades. The apothecary today rarely "compounds" prescriptions; most medications are produced by pharmaceutical manufacturers who are able to apply better controls from the testing of raw materials, through the manufacture of ingredients, to the compounding of the medication and the testing of the product. Since much of this is now performed by automatic machinery in large volume, a much higher degree of uniformity at much lower unit cost can be realized than would be possible by the older method of compounding by hand with mortar and pestle.

This trend is paralleled elsewhere. In the early days of opticianry, ophthalmic lenses for eyeglasses were ground and polished to prescription by the optician. Today, ophthalmic lenses are mass-produced in a wide range of optical strengths, in small increments of difference in diopters, with the volume in each strength determined by statistical data about the visual needs of the population to be served. Today the optician merely selects a standard lens of the strength called for by the prescription, cuts it to the shape and size required by the eyeglass frame, grinds the edges (not the optical surface) and fits the lens to the frame. As with prescriptions for medicine, this arrangement provides a much higher level of uniformity and reliability, at much lower unit cost, than would be possible with the old hand method. Custom tailoring and shoemaking have followed the same path.

Similarly, the prescriptions found in the *Merck Manual* (12th Ed., 1972), at pp. 1849–1893 reflect this trend in pharmaceutical manufacture; by and large the prescriptions are of single articles without the "recipe" for compounding.

### Articles in the U.S.P. as "Drugs"

The difficulty with any attempt to apply the statutory term "drugs" as a comprehensive noun for all the chemicals, substances and materials in the U.S.P. is evident from the fact that a very large number of them have multifarious characteristics, qualities and uses other than the medicinal ones to which the word "drug" naturally applies.

"Water" is recognized (p. 776) as $H_2O$, with a molecular weight of 18.02, and described as a "clear, colorless, odorless liquid." After a number of assay specifications it is put in the category of "Pharmaceutic aid (solvent)."

Further on in the book, under the section on "General Information and Procedures," an explanation for recognizing "water" is given:

"Inasmuch as water is used more copiously and widely than any other substance in pharmaceutical manufacturing, its quality is of the utmost importance. Adequate control over the quality of the water supply involves exceptional difficulties, since the basic source, usually a municipal system, is influenced by many and varied factors. * * *

"In view of the fact that water is required for a variety of purposes ranging from the needs of [pharmaceutical] manufacturing processes to the final preparation of therapeutic agents just prior to their administration to patients, the Pharmacopeia provides five monographs for water, as follows:

"WATER (see page 776).—This article is *simply potable water* delivered by the municipal or other local public system or drawn from a private well or reservoir. It is the *starting material* for all other forms of water covered by pharmacopeial monographs, and is *not to be used* in any other U.S.P. article or in the preparation of reagents or test solutions. It is not subject to packaging and storage requirements   *   *   *"   (U.S.P. XVIII, pp. 838–9.   Emphasis added).

Thus, the fact that "water" is recognized in the U.S.P. cannot be a basis for considering it a "drug."   For pharmaceutical use, it must first be converted into one of the other four kinds of water that are U.S.P. recognized: "Water for injection," "Bacteriostatic water for injection," "Sterile water for injection" and "Purified Water" (U.S.P. XVIII pp. 777–9).

To construe the statute as defining ordinary, potable tap water (which is far from standardized) to be a "drug," either for the purposes of misbranding and adulteration or of determining that it is "safe and efficient" would be ridiculous.

It would imply that the many forms of water shipped in interstate commerce, from spring water, through club soda, ginger ale and other soft drinks to beer and other beverages based on water, are "drugs" for the purposes of the Act.

Most oral medications, in the form of tablets and capsules are swallowed with ordinary tap water—the water that the U.S.P. cautions "is not to be used" in any U.S.P. article.

What is true of water is also true of other U.S.P. articles such as

.   .   .   Carbon dioxide (p. 99), which has medicinal use as a respiratory stimulant; but if it be a "drug," and if its liquified and solid forms had been discovered in 1975, neither the $CO_2$ fire extinguisher nor dry ice could be shipped in interstate commerce without a new drug application to establish these forms as "safe and effective;"

.   .   .   Nitrogen (p. 450), which is a pharmaceutic aid for air displacement; yet if it be a "drug," so would anhydrous ammonia, widely used as a fertilizer, of which nitrogen is a constituent;

.   .   .   Oxygen (p. 467), which is a medicinal gas; but if it be a "drug," so would be the oxyacetylene torch and the oxygen steel process.   Compressed air, which contains oxygen, nitrogen and carbon dioxide (along with other gases) is daily transported interstate in millions of automobile and truck tires. It is also marketed in cans used to blast whisker clippings from electric shavers and dust from photographic negatives.

Other articles "recognized" by U.S.P. include corn oil (p. 145) and olive oil (p. 459) as well as carnauba wax (p. 779), which is widely used in automobile polishes, and white wax (p. 780), which is bleached and purified beeswax, used for centuries by tailors to strengthen thread.   Lanolin (p. 358), derived from sheep's wool, is widely used as a dressing to keep leather soft and supple; but is a "recognized article" in the U.S.P. So are starch (p. 682) and sucrose (p. 692), which is sugar.

Items of this kind are not numerous, but they are there, "recognized" as U.S.P. "articles."   Common and widely used chemical

substances or feedstocks with many non-pharmaceutical or medicinal uses are more numerous. A few of these are coal-tar (p. 136) from which countless products are derived; silver nitrate (p. 602) whose primary use probably is for the manufacture of photographic emulsions; glycerin (p. 285); acetic acid (p. 15); alcohol (p. 20); aluminum sulfate (p. 30); calcium chloride (p. 89); calcium hydroxide (p. 93); camphor (p. 97); activated charcoal (p. 104); citric acid (p. 134); collodion (p. 143); ferrous sulphate (p. 265); gelatin (p. 277); helium (p. 295); hydrochloric acid (p. 301); lemon oil (p. 359); phenol (p. 490); potassium chloride (p. 520); potassium . hydroxide (p. 522); potassium iodide (p. 522); sodium benzoate (p. 610); sodium carbonate (p. 613); sodium chloride (p. 615); sodium hydroxide (p. 631); sodium thiosulfate (p. 672); sulfur dioxide (p. 700); tragacanth (p. 742) and zinc oxide (p. 784).

### Reagent Chemicals as "Drugs"

The specifications for these chemicals, the *names* of many of which also appear as articles recognized in the U.S.P., are prepared by the Committee on Analytical Reagents of the American Chemical Society. See "Reagent Chemicals" (RC), Fourth Edition, p. 1. The specifications are intended to serve for reagents to be used in precise analytical work. *Idem.*

The general principles that guide the committee are (1) to base a specification prepared for the first time on the highest level of purity for the reagent that is competitively available in the United States, and (2) if a higher level of purity becomes available on a competitive basis, the specification is revised accordingly.

Thus, it is plain that the committee does not establish standards of purity in the sense of originating them. What it does do is to survey the available reagents, conduct tests of purity, select those competitively available having the highest purity among the whole array, and *describe* them. This description becomes the standard.

Although RC does not appear to say so explicitly, manufacturers of reagent chemicals are probably allowed to designate a chemical as "Analytical Reagent," or in some other suitable way indicate that the chemical meets the RC specifications.

If a chemical so labeled does not meet the specifications, there probably are professional sanctions or private lawsuits available as remedies. In addition, the FTC probably has jurisdiction under the false advertising statutes.

In any event, the FDCA does not refer to RC as a standard or as a pharmacopeia, and it is plain than an analytical reagent, though bearing the same *name* as an article recognized in the U.S.P., is not a "drug" on that account.

A pharmacopeia recognizes articles having some pharmacological use or medicinal use, and establishes the standards for those purposes. RC specifications, on the other hand, are intended for use in chemical laboratories of all kinds, the much greater volume being in fields of activity not related to pharmacy or medicine.

As a practical matter, analytical reagents could no doubt be used as ingredients for medications; they attain a higher degree of purity. But there would be no point to it because the differences between U.S.P. grade and analytical grade are doubtless too small to provide any advantage, and the cost would be unnecessarily too high.

Neither the standard meter at the U.S. Bureau of Standards nor a set of Johannsen blocks calibrated to it would ever be used to gauge the output of a production line. Other, much less less costly measuring instruments are used for that purpose, after calibration against the standards.

The U.S.P., at pp. 952–1019, does contain a section on reagents which are used in conducting pharmacopeial tests and assays. It states explicitly at the outset of the section that

". . . listing of reagents . . . in the Pharmacopeia in no way implies that they have therapeutic utility, thus, any reference to the U.S.P. in their labeling is to include the term 'reagent' or 'reagent grade'."

The explanatory note also points out that the reagents listed fall into three categories: (1) those for which individualized specifications are needed for pharmacopeial tests and assays; (2) those for which the RC specifications are appropriate; and (3) all other reagents.

For category (1), the U.S.P. itself states the specifications; for categories (2) and (3), the U.S.P. merely states that "a suitable grade" is to be used. This term means that if there is an RC specification for the reagent, that is the one used; and if there is not, then a suitable reagent grade that is commercially available may be used.

This explanation makes clear that for reagents listed in RC, and listed in U.S.P. with the term "a suitable grade", U.S.P. does not purport to set the standard. And the same is true where the term is used and the reagent is not listed in RC.

Because of their nature and the disclaimer of therapeutic utility, reagents listed in U.S.P. for laboratory test purposes are probably not intended by Congress to be "drugs", on the ground that they are "articles" which the U.S.P. recognizes.

### Misbranding and Adulteration

This is really a problem of jurisdiction among administrative agencies. Where professional standards have been adopted as in the case of U.S.P., NF and HP, Congress no doubt may say that anything labeled to indicate compliance with those standards, which in fact does not comply, may not be shipped in interstate commerce without being subject to whatever statutory sanctions may be provided. This kind of enactment poses no problem of unlawful delegation of legislative power.

What Congress seems to have done is to have assigned the enforcement function to FDA if the item is a "drug" (Title 21), and also to have assigned a similar function to the FTC as a matter of "false advertising" if it is not a "drug". (Title 15). For biologics, the enforcement function may well be in the Public Health Service (Title 42). [Or was, until the reorganization noted above]

Since each agency is differently structured, organized and administered, the administrative process itself may be confronted at the outset with a jurisdictional issue, and without having a common entry point through which the matter can be channeled to the proper route.

In any event, it seems clear that for articles in interstate commerce, if they are not what they are represented to be, there is a remedy somewhere that does not depend on whether the article is or is not a "drug."

### "Safe and Effective"

This provision of Title 21 presents formidable difficulties. As noted above, most of the articles in the U.S.P. are single items rather than formulas for compounding. Some of them may have specific, single uses (e. g., Rabies Vaccine, p. 584). Many have more than one medicinal use. Some contain poisons (Ammoniated Mercury, p. 407; Sodium Fluoride, p. 627) in the concentrated form described. Sodium Hydroxide, p. 631, is also known as caustic soda and is hardly safe, even for external use, when it contains the minimum of 95% of total alkali called for by the monographs. Glacial Acetic Acid at 99.5% (p. 16) must be handled with great care. Sodium Heparin, p. 629, is doubtless an effective anticoagulent but the safety of it will depend a great deal on the condition of the individual patient and the dosages administered.

Ether, p. 249, is highly effective for general anesthesia, but it is highly volatile, flammable and explosive. And other items may be entirely "safe", but whether they are "effective" can well depend on the accuracy of the diagnosis, as with some antibiotics, as well as on the conditions of the patient's vital organs.

Thus, for many of the articles in U.S.P. the question whether they are "safe" and "effective" cannot be answered directly but well depend on having first considerably more information.

In terms of the U.S.P. articles, this test is one that is difficult to apply in any rational sense, and in some cases, cannot be applied

at all, if only because many U.S.P. articles are no more than primary ingredients for the manufacture of pharmaceuticals in which they may be only a part of the chemical process of manufacture (not appearing at all in the finished product) or may be used in small and highly diluted quantities as part of a compounded prescription.

Thus, the "safe and effective" test is probably rational when applied to the final medications furnished to the patient, and which are covered by the definitions in (B) and (C) of 21 U.S.C. § 321(g)(1), but probably not to the definition in (A) of that section.

### Summary

The foregoing is by no means definitive, and doubtless contains a number of errors in detail. Its sole purpose is to provide an outline or framework of the outbranches of the whole subject, as an aid to better understanding. The facets are numerous and the relationships are complex.

This appendix is attached to and made part of the Opinion dated July 16, 1975.