UNITED STATES

v.

ARTICLES . . . PROVIMI, etc.

Civ. No. 76–871.

United States District Court,
D. New Jersey.

Jan. 21, 1977.

Jonathan L. Goldstein, U.S. Atty., by Kenneth N. Laptook, Asst. U.S. Atty., Newark, N.J. and Edward Basile, Asst. Chief Counsel, for Enforcement of Food and Drug Administration, for plaintiff.

Fox, Carpenter & O'Neil by Bruce C. O'Neil, Milwaukee, Wis., for defendant.

## MEMORANDUM ORDER

BIUNNO, District Judge.

Following the partial hearing in this case in December, 1976, both sides have submitted memoranda on the question whether the court can, and if it can, should, order that the Articles be brought into compliance by reconditioning, as provided by 21 U.S.C. § 334(d).

Except for the data showing the proportions of challenged items in the existing products, and the proportions ensuing after the proposed blending with new products, neither presentation submits facts of the kind requested by the court at hearing.

In principle, it seems obvious that a blending procedure may well be appropriate under the statute but the principle alone is not enough. The court must also have fact information, either agreed to or established by proof, as a basis for evaluating the question whether the suggested blending program will come within the statute, and whether it should be authorized.

While all the products contain one or another antibiotic animal drug (either zinc bacitracin or chlortetracycline), the products themselves are evidently not medications but animal feeds containing small quantities of these drugs. (Some 112,200 lbs. of Provikalf Grower contains 3.09 lbs. of zinc bacitracin, for example).

The generic drugs, as such, seem to be recognized as appropriate ones to add to the feeds, just as minerals and vitamin supplements are. The basic and major component of the product is evidently dry milk powder. Claimant's problem arises, not from any impropriety in the use of one or the other of the two antibiotics generically, but from the fact that it obtained its supply from a manufacturer overseas which had not obtained FDA approval for its own products. Thus, while both antibiotics may well be precisely what their generic terms indicate, and while they even may be in wide, general use in other countries with no adverse effects, the absence of FDA approval for the particular manufacturer's products results in "deeming" them illegal drugs. The milk powder is accordingly "contaminated" by statute. It may or may not be contaminated in fact.

Whether an article in interstate commerce is a food or a drug, the court is well aware that no named substance, whatever it may be, can be "absolutely pure". See, *U. S. v. An Article . . . Ova II*, 414 F.Supp. 660 (D.N.J.1975), *aff'd* 535 F.2d 1248 (CA–3, 1976).

Cursory items taken from the U.S. Pharmacopaeia XVIII show that at best, items intended for use as drugs, for human use, inevitably contain impurities. To achieve acceptance for use as U.S.P. grade, limits are set above which the particular impurities may not exist, the tolerance level depending mainly on the risk of adverse ef-

fects. Impurities such as arsenic and "heavy metals", which are extremely toxic, provide good examples to illustrate the point.

Thus, to achieve acceptance, Sodium Bicarbonate, $NAHCO_3$, may not contain more than 3 parts per million of arsenic. See *U.S.P., supra,* pp. 610–611.

Aspirin, $C_9 H_8 O_4$, has a limit of 10 parts per million of heavy metals, *idem.,* pp. 53–54; and Ascorbic Acid, $C_6 H_8 O_6$ has a limit of 20 parts per million of heavy metals, idem., pp. 51–52.

None of these substances contains arsenic or any other heavy metal in its molecule. One contains sodium, and all contain hydrogen, carbon and oxygen. The arsenic and other heavy metals (e. g., lead) are obviously impurities.

The blending program proposed by claimant would result in final products containing, as an impurity, one or another of the "deemed" illegal drugs in concentrations of either 1/10,000 of 1% or 2/10,000 of 1%. These fractions work out, as the court calculates them, to 1 part per million or 2 parts per million. Unless the "deemed" illegal antibiotics are more toxic than arsenic or other heavy metals, it appears that the ensuing concentrations after the blending program would be negligible.

The point at issue, as the court understands it, is that the blending program is designed to reconstitute (for example) 112,-200 lbs. of milk powder in Provikalf Grower, rather than to salvage the 3.09 lbs of "deemed" illegal zinc bacitracin which those 56 tons contain. The question seems to be one of whether the milk powder can be salvaged, through blending, by reducing the level of the "deemed" illegal ingredient to a point where its presence is less significant than 3 parts per million of arsenic would be.

The court is generally aware that countless products are manufactured by blending methods to achieve some specified proportion of one or another ingredient even though the proportions available in raw materials or intermediate materials may vary widely.

In the United States, for example, Scotch whiskey has long been marketed at 86.8 proof (43.4% of alcohol by volume). The output of the many stills in Scotland does not turn out any product at 86.8 proof. The raw materials from the stills are blended and adjusted so that the final product meets the desired proof level. In England, the same raw materials are blended and adjusted to culminate in a Scotch whiskey of 70 proof.

Similarly with butter. Winter butter is white and without flavor, much like lard, because the cows are feeding on hay instead of pasture grass. Blending and adjusting for color and flavor with additives results in the commercial production of butter (or margarine for that matter) that maintains essentially the same color and flavor in winter and summer.

Iodized salt provides another widely known example. Salts of iodine have been added to table salt for many decades as a recognized prophylactic measure to prevent various forms of goiter. This practice is so well established and so widely used that iodized salt (sodium chloride) is not even mentioned in U.S.P. or in the National Formulary.[1]

Suppose a salt manufacturer, through some error of a workman or a defect in a machine, turns out 50 tons of table salt with too much iodine—so much more than the acceptable level that the product cannot safely or legally be sold. Should the 50 tons of salt be destroyed, or should the manufacturer be allowed to blend it with a sufficient quantity of plain salt, with no iodine, to bring the concentration in the blended product down to a proper level? The answer seems obvious.

■ Despite what seems obvious, the court hesitates to decide the issues on pure-

---

1. The treatment of goiter with iodine is said to go back to ancient times, when physicians in China prescribed the ingestion of burnt seaweed (which contains iodine) with food. *The*

*Lincoln Library of Essential Information,* 34th Ed., 1971, p. 1001–2 (Frontier Press, Columbus, Ohio).

ly legal grounds. More factual information ought to be provided before deciding one way or the other.

The court accordingly proposes to appoint an independent expert witness, pursuant to Fed.Ev. Rule 706 to make a study and report on the fact aspects of the issue. The court proposes to appoint Dr. Sheldon Atlas, of the Polytechnic Institute of New York, 333 Jay Street, Brooklyn, N.Y. A copy of his curriculum vitae is furnished to the parties with this ruling.

Both parties are directed to show cause why an order appointing him should not be entered, and to submit proposed directions for his study and report. The submissions are to be in the hands of the court on or before February 15, 1977.

It is the court's intention to limit the initial study and report to a review and analysis of known and recognized methods of blending in a variety of manufacturing processes, but short of the conducting of any laboratory tests or analysis, in order to minimize the cost and expense of the procedure.

The court also intends to assess one-half of the cost of the expert's services in conducting the study and preparing the report, and for any testimony which either or both parties, or the court, may wish to have after review of the report, with further decision on the expert's cost to abide the event.

The court also needs to know whether there is any fact dispute over the representations of claimant in respect to the quantity of each product involved, and the proportion of antibiotic, as set forth in its memorandum. To provide a basis for easier evaluation, the court has taken the material as represented and converted it by calculation to determine the amount of each antibiotic present in grams, ounces and pounds.[2] The parties are asked to check and verify these calculations in their responses to the order to show cause.

Finally, it is noted that if an order to recondition the condemned feeds is to be entered under 21 U.S.C. § 334(d), the reconditioning is to be under administrative supervision with the cost of supervision to be paid by claimant under bond.

The court has no cost data before it, either for the cost of blending or the cost of administrative supervision of the blending. It may be that these combined costs are such as not to make it economically feasible to recondition by blending those items whose quantity amounts to less than 2 tons. (Prodalin R, Grober Supplement, Provimelk Premix and Chlortetracycline Premix). For these smaller quantities it may be that the value of the main ingredient is too low to balance against the costs of reprocessing, blending and supervision. It may be more cost effective to sell these smaller quantities for reprocessing into some useful non-food product such as casein glue. Claimant may wish to consider one or another form of such alternative routes, just as a batch of iodized salt with too much iodine might be

---

**2.** *Provikalf Starter, containing zinc bacitracin (ZB) 78,850 lbs, or 39.43 tons, at 50 gms. per ton means 1,971.25 gms., or 69.53 oz., or 4.35 lbs of ZB.*

*Provikalf Starter, containing zinc bacitracin (ZB) 112,200 lbs, or 56.10 tons, at 25 gms. per ton means 1,402.50 gms., or 49.47 oz., or 3.09 lbs of ZB.*

*Provimelk, containing zinc bacitracin (ZB) 20,-700 lbs or 10.35 tons, at 125 gms. per ton means 1,293.75 gms., or 45.63 oz., or 2.85 lbs of ZB.*

*Prodalin R, containing chlortetracycline (CTC) 2,900 lbs., or 1.45 ton, at 50 gms. per ton means 72.50 gms., or 2.56 oz., or 0.16 lbs of CTC.*

*Grober Supplement, containing chlortetracycline (CTC) 2,750 lbs, or 1.38 tons at 150 gms.*

per ton means 206.25 gms., or 7.28 oz., or 0.45 lb of CTC.

*Provikalf Grower Premix, which contains zinc bacitracin (ZB) 50,105 lbs, or 25.05 tons, at 1,000 gms. per ton means 25,052.50 gms., or 883.69 oz., or 55.23 lbs of ZB.*

*Provikalf Starter Premix, containing zinc bacitracin (ZB) 33,055 lbs, or 16.53 tons, at 2,000 gms. per ton means 33,055 gms., or 1,165.96 oz., or 72.87 lbs of ZB.*

*Provimelk Premix, containing zinc bacitracin (ZB) 1,850 lbs, or 0.925 tons, at 5,000 gms. per ton means 4,625 gms., or 163.139 oz., or 10.196 lbs of ZB.*

*Chlortetracycline Premix (CTC) 1,870 lbs, or 0.935 ton, at 2,000 gms. per ton means 1,870 gms., or 65.96 oz., or 4.123 lbs of CTC.*

salvaged for non-food uses such as for melting ice.

The parties are also asked to review the transcript of the partial trial in December, 1976, and to include in their submissions to the order to show cause factual data of the kind then requested.

Nothing in this memorandum order precludes either party from presenting facts tending to show whether the presence (qualitative) or amount (quantitative) of zinc bacitracin or of chlortetracycline in the condemned items either can or cannot be ascertained by test with reasonable accuracy, or, if they can be so ascertained, that each generic substance does or does not carry some specified degree of risk aside from the statutorily "deemed" illegality.

SO ORDERED.