## UNITED STATES

v.

## ARTICLES . . . . PROVIMI, etc.

### Civ. No. 76–871.

United States District Court,
D. New Jersey.

March 15, 1977.

Jonathan L. Goldstein, U. S. Atty. by Kenneth N. Laptook, Asst. U. S. Atty., Newark, N. J., and Edward Basile, Asst. Chief Counsel, for Enforcement of Food and Drug Administration, Washington, D. C., for plaintiff.

Fox, Carpenter & O'Neil by Bruce C. O'Neil, Milwaukee, Wis., for defendant.

## MEMORANDUM

BIUNNO, District Judge.

The parties have made submissions in response to the order to show cause why an independent expert witness, Dr. Sheldon Atlas, should not be appointed under Fed.Ev. Rule 706. See 425 F.Supp. 228 (D.N.J.1977).

The original submissions appeared to agree that an independent expert was not needed; it seemed that if the court ordered the articles to be brought into compliance by reconditioning, as authorized by 21 U.S.C. § 334(d), the parties foresaw no difficulties in arranging the procedures to be carried out under the supervision of the agency as provided by 21 U.S.C. § 334(d)(1), at claimant's expense for the supervision. Accordingly, neither side submitted proposals for the directions to be given for the expert's study and report.

In the submission of the United States, two points were argued beyond the scope of the order to show cause. One was entirely a legal argument, namely that no animal feed containing any "deemed illegal" antibiotic could be authorized, no matter how miniscule the proportion, and presumably even if the proportion was so small that its presence could not be detected at all. This point was irrelevant to the order and will be disregarded now, without prejudice to its presentation at the proper time.

The other point was based on an affidavit of Gerald B. Guest, a doctor of veterinary medicine employed since 1970 by the Food and Drug Administration, and before that by the Department of Agriculture. He describes what must be submitted to support an application for a new animal drug under 21 U.S.C. § 360b (quoting the Act). This might be relevant in a case where the issue was whether such an application should be approved for a new animal drug. It is not relevant here because the antibiotics of foreign manufacture whose incorporation in the feed led to the seizure were never the subject of an application, claimant has no intention to make such application, and they are already statutorily "deemed" illegal.

The affidavit goes on to say that antibiotics differ from other drugs because they are extremely potent chemicals produced by microbial fermentation; their activity is evi-

denced at extremely low levels; and, he goes on the say that "this activity" (i. e. potency) can be altered [sic], diminished or eliminated by contamination from other sources during the termination process or while in the purified pharmaceutical form.

This raises a question of fact, which is precisely why the court detected the need for an independent expert. And, as submitted, the assertion is far from clear. As used for argument by the United States, the implication is that zinc bacitracin and chlortetracycline are themselves biological substances capable of continued fermentation after termination so as to increase either the potency or the quantity contained in the seized feed. Is this what the statement means?

The fermentation of flour and water in the presence of the biological activity of yeast will continue so long as there is any unfermented flour, or until the resulting alcohol terminates the process. This is well-known to anyone who has stirred up some sourdough starter.

Similarly, grape juice will ferment into wine by biological action (oxygen being excluded to prevent the formation of vinegar) until a critical concentration of alcohol has been reached, bringing the process to a halt. The same is doubtless the case with the fermentation of molasses, malt and hops, barley, corn, potatoes and other feedstocks of sugar or starches. To gain higher concentrations of alcohol than those reached when fermentation stops, distillation is required, and once the distillation process is completed, further fermentation cannot be started or continued. The alcohol, in the presence of oxygen, can be converted to acetic acid, and in the presence of sulphuric acid, can be converted into ethyl ether. Every high school chemistry student who does his homework knows this.

So, the fact question is whether zinc bacitracin or chlortetracycline, once separated from the microbially fermented "mash", can continue to multiply itself or gain potency. The affidavit is silent on this point. It does make clear that it can diminish in

potency, or lose its potency altogether, but those alternative results would go against the government's argument. Who fears Samson when his locks are shorn?

Since a fact issue has been raised, the court is convinced of the need to have the aid to understanding that an independent expert can provide, and will make the proposed appointment. Claimant has also detected these (and other) problems arising from the position of the United States and now agrees that the expert be appointed.

Before that can be done, the court must have the perceptive and constructive support of both parties in order to settle the directions to be given to the expert, so that his aid will be efficient and at the least feasible cost and expense. The effort to gain this aid by mail has proven sterile, and too much time has gone by.

The court believes the matter will be best approached by a conference with counsel, also attended by Dr. Atlas, both sides being free to bring an expert of their own to participate. The court has neither the desire nor the intention to decide sophisticated fact issues on the basis of judicial notice of the teachings of high school chemistry. Its object is to make an informed decision.

Since nearly all the court's time has been and is consumed by jury trials of criminal cases, ever since the taking effect of the Speedy Trial Act of 1974, the parties will be expected to keep themselves and their experts in readiness to attend the conference on short notice. The case presently on trial began January 11, 1977, and (hopefully) will be concluded by Easter. The likelihood is that the conference can be scheduled for a day in the week of April 11 or April 18, 1977. The court will provide as much advance notice as possible, but makes no promises or representations in that regard.

Meanwhile, the parties can productively address themselves to the gathering of data of the kind requested at the partial trial of December 3, 1976 as directed by the order of January 21, 1977, but ignored by both sides, and any other pertinent matters.